## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK J. BUNIM, Derivatively on Behalf of STONEMOR PARTNERS, L.P, <br><br> Plaintiff, <br><br> vs. <br><br> LAWRENCE MILLER, HOWARD L. CARVER, ALLEN R. FREEDMAN, MARTIN R. LAUTMAN, FENTON R. TALBOTT, WILLIAM R. SHANE, JONATHAN A. CONTOS, ROBERT B. HELLMAN, JR., LEO J. POUND, and SEAN P. MCGRATH, <br><br> Defendants. <br><br> STONEMOR PARTNERS, L.P., <br><br> Nominal Defendant. | Civil Action: <br><br><br> **VERIFIED SHAREHOLDER** <br> **DERIVATIVE COMPLAINT** <br><br><br> **JURY DEMANDED** |

Plaintiff Mark J. Bunim ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant StonerMor Partners, L.P. ("StoneMor" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by StoneMor with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a shareholder derivative action brought in the right, and for the benefit, of StoneMor against certain of its officers and directors seeking to remedy Defendants' (as defined below) breach of fiduciary duties, gross mismanagement and unjust enrichment that occurred and have caused substantial harm to StoneMor.

2.      This Action arises out of a scheme and wrongful course of conduct whereby Defendants (defined below) disseminated to the market materially false and misleading statements regarding the Company's business and financial performance, relying heavily on opportune accounting metrics created (and modified) by the Company which undermined its audited financials, in order to convey to unitholders and the market that the Company was a profitable business that was generating significant cash flow from which to pay high yield profit distributions to unitholders.

3.      In fact, the Company's statements to the market were based on a financial shell game that involved raising capital from investors just in time to distribute a portion of it back to investors and the operators of the scheme.  The Company's statements were based on misleading non-GAAP financial presentations in order to mislead investors into purchasing the Company's equity units.  The Company's senior management expressed contempt for GAAP to create an illusion of profitability.   As long as the Company was able to continue selling high-yield securities to new investors, the Company was able to continue making distributions to old investors and the managers of the scheme.

4.      From its beginning of the Company's inception, it has never generated sufficient cash flow from operations to make its distributions.  Since 2005, the Company raised $508 million from investors who were hood winked into believing that the Company's business was healthy and generating significant cash flow.

2

5.      Under the terms of the Company's Limited Partnership Agreement (the "LPA"), the General Partner receives additional distributions when the Company issues distributions above a predetermined threshold.  That is, if the Company issues quarterly distributions in excess of $0.51/unit, the General Partner is able to increase the amount of money it receives.  One of the Company's officers behind the scheme was CEO Lawrence Miller ("Miller") who serves as a director of both StoneMor and the General Partner.

6.      The Company's scheme unraveled when it could no longer raise capital to pay distributions, which caused its perception of success to dissipate.  On September 2, 2016, the Company announced it was going to restate its financials to correct various errors. The Company took over two (2) months to file its restatements.  On information and belief, during the pendency of its restatement, the Company was unable to and did not sell new units or raise new capital from investors.  This failure to obtain fresh capital seriously constrained the ability of the Company to pay its inflated "profit" distributions.  The SEC has since prohibited the Company from relying on its misleading Adjusted EBITDA (non-GAAP) financial metric moving forward.

7.      On October 27, 2016, with no new capital infused in the Company, StoneMor cut its distribution in half.  While the whole truth underlying the reasons for that reduction in distribution price have not yet been made public, the news shocked the market and caused the price of the Company units to drop by over 45% by the close of trading the following day.

8.      Shortly thereafter, on November 9, 2016, the Company filed a Form 8-K with the SEC and announced that it would "amend its From 10-K for fiscal year ended December 31, 2015, and its Forms 10-Q for the quarterly periods ended June 30, 2016 and March 31, 2016." These restatements came right after a review by the SEC who, subsequently, required the Company to change "the format of [its] earnings release [such that it, will no longer be able to

provide Adjusted EBITDA, a non-GAAP measure heavily relied on by the Company] as a performance metric within future earnings releases."

9.      Thus, with no new capital and an inability to rely on previously used misleading non-GAAP financial metrics, the Company's scheme collapsed.

## JURISDICTION AND VENUE

10.     This Court also has jurisdiction over the claims asserted herein under 28 U.S.C. §1331 because the claims arise under and pursuant to § 14(a) of the Exchange Act (15 U.S.C. §78n(a)) and Rule 14a-9 promulgated there under (17 C.F.R. §240.14a-9).

11.     Venue is proper in this Court because the Company maintains its executive office at 3600 Horizon Blvd., Suite 100, Trevose, PA 19053, a substantial portion of the transactions and wrongs complained of herein occurred here, and Defendants have received substantial compensation within the District of Pennsylvania by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

12.     This Court also has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of fees and costs.

## PARTIES

### PLAINTIFF

13.     Plaintiff Mark J. Bunim ("Bunim") is, and was, a shareholder of StoneMor during the time Defendants were breaching their fiduciary duties.  Plaintiff Bunim made his first purchase of StoneMor securities on October 28, 2011.  Plaintiff Bunim will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff is a citizen of New York.

NOMINAL DEFENDANT

14.     **Defendant StoneMor** is a Delaware limited partnership headquartered at 3600 Horizon Boulevard, Trevose, Pennsylvania 19053.  Nominal Defendant StoneMor is a citizen of Pennsylvania.

DIRECTOR DEFENDANTS

15.     **Defendant Lawrence Miller** ("Miller") was, at all relevant times, Chief Executive Officer ("CEO"), President, and Chairman of the Board of Directors ("Board") of StoneMor. Miller is the founder of the Company.  Miller is a citizen of Pennsylvania.

16.     **Defendant Howard L. Carver** ("Carver") has been a member of the Board since August 2005.  Carver is a citizen of Colorado.

17.     **Defendant Allen R. Freedman** ("Freedman") has been a member of the Board since August 2004.  Freedman is the Chair of the Audit Committee.  Freedman is a citizen of Florida.

18.     **Defendant Martin R. Lautman** ("Lautman") has been a member of the Board since August 2004.  Lautman is a member of the Compensation Committee.  Lautman is a citizen of Pennsylvania.

19.     **Defendant R. Talbott** ("Talbott") has been a member of the Board since August 2004.  Talbott is a member of the Compensation Committee.  Talbott is a citizen of Missouri.

20.     **Defendant William R. Shane** ("Shane") has been a member of the Board since August 2004.  Shane founded the Company with Miller and served as Executive Vice President and Chief Financial Officer ("CFO") of the general partner since its formation in April 2004 until April 1, 2012, and served as Executive Vice President and Chief Financial Officer of Cornerstone since March 1999 through April 2004.  Effective April 1, 2012, Shane retired from

5

his position as the Executive Vice President and CFO and became the Vice Chairman of the Board and serves as an advisor available to management.  Shane is a citizen of New Jersey.

21.     **Defendant Jonathan A. Contos** ("Contos") has been a member of the Board since August 2014.  Contos is a citizen of California.

22.     **Defendant Robert B. Hellman, Jr.** ("Hellman") has served on the Board since StoneMor's formation in April 2004.  As per the Company's public filings, Hellman maintains "exclusive voting and investment power over 67.03% of membership interests in the General Partner."  Further, Hellman also co-founded American Infrastructure MLP Funds in 2006, which committed at least $130 million to the Company during the Relevant Period, enabling StoneMor to pay out distributions to unitholders. Hellman is a member of the Compensation Committee. Hellman is a citizen of Arizona or California.

23.     **Defendant Leo J. Pound** ("Pound") has been a member of the Board since August 2014.  Pound is a citizen of Florida.

**OFFICER DEFENDANT**

24.     **Defendant Sean P. McGrath** ("McGrath") served as the Chief Financial Officer of the General Partner since 2015.  On January 23, 2017, the Company announced that McGrath resigned as Chief Financial Officer.  McGrath remained in his current role as CFO until the filing of the Company's Annual Report on Form 10-K for the year ended December 31, 2016. McGrath is a citizen of Pennsylvania.

## SUBSTANTIVE ALLEGATIONS

**BACKGROUND**

25.     StoneMor purports to be the second largest provider of funeral and cemetery products and services in the death care industry in the United States.  As of March 31, 2016, the

Company operated 307 cemeteries in 27 states and Puerto Rico, of which 276 are owned and 31 are operated under lease, management or operating agreements.  The Company also owned and operated 104 funeral homes in 19 states and Puerto Rico.

26.     During the Relevant Period, the Company was successful in renegotiating its credit facility agreements and increasing the Company's line of credit significantly.   The Company also diluted unitholders through several public offerings, private placements, and debt offerings.  The Company created the illusion that it had adequate cash to payout a quarterly profits distribution that triggered incentive payments owed to the General Partner, including certain executives and Board members, under the LPA.

27.     Pursuant to the Company's April 14, 2016 Registration Statement, the General Partner:

> Currently holds incentive distribution rights that entitle it to receive increasing percentages, up to a maximum of 49.21%, of the cash [StoneMor] distributes from operating surplus in excess of $0.5125 per unit.  The maximum distribution of 49.21% includes distributions paid to the general partner on its 1.21% general partner interest, and assumes that the general partner maintains its general partner interest at 1.21%, but does not include any distributions that the general partner may receive on units that it owns.

28.     Throughout the Relevant Period, the Company made quarterly distributions that either stayed consistent or increased.   The Company's quarterly distributions are listed in the chart set forth below:

| Announcement Date | Price per Unit |
| --- | --- |
| 01/25/2012 | 0.585 |
| 04/25/2012 | 0.585 |
| 07/20/2012 | 0.585 |
| 10/22/2012 | 0.59 |
| **2012 TOTAL** | **2.345** |
| 01/25/2013 | 0.59 |
| 04/24/2013 | 0.595 |

| Announcement Date | Price per Unit |
|---|---|
| 07/23/2013 | 0.60 |
| 10/25/2013 | 0.60 |
| **2013 TOTAL** | **2.385** |
| 01/27/2014 | 0.60 |
| 04/24/2014 | 0.60 |
| 07/25/2014 | 0.61 |
| 10/24/2015 | 0.62 |
| **2014 TOTAL** | **2.43** |
| 01/26/2015 | 0.63 |
| 04/24/2015 | 0.64 |
| 07/24/2015 | 0.65 |
| 10/27/2015 | 0.66 |
| **2015 TOTAL** | **2.58** |
| 01/26/2016 | 0.66 |
| 04/25/2016 | 0.66 |
| 07/25/2016 | 0.66 |
| 10/27/2016 | 0.33 |
| **2016 PROJECTED TOTAL** | **2.31** |

## THE FALSE AND MISLEADING STATEMENTS

29.     On January 19, 2012, the Company amended its Credit Agreement to combine its credit facilities into one revolving credit facility, increased the borrowing commitment by $10.0 million, extended the maturity date to January 19, 2017, and amended the interest rate and certain financial covenants.

30.     On March 15, 2012, the Company issued a press release that announced the Amended Credit Agreement and results of operations and also highlighted various "critical financial measures" for the three months and year ended December 31, 2011, which "include both GAAP measures as provided for in [the Company's] quarterly and annual financial statements, and non-GAAP measures that [the Company] believe[s] are relevant to [its] ability to make cash distributions to common unitholders."

31.     The above-referenced Company press release demonstrates huge discrepancies between the Company's GAAP and non-GAAP measures. For example, for year-end December

31, 2011, Total Revenues (a GAAP figure) equaled approximately $58.73 million compared to Production Based Revenue (a non-GAAP figure) which was reported as approximately $75.87 million for the same period; Operating Profit (a GAAP figure) equaled approximately $9.8 million as compared to Adjusted Operating Profit (a non-GAAP figure) for the same period of approximately $48.55 million; Operating Cash Flow (a GAAP figure) reportedly equaled approximately $5.47 million while Adjusted Operating Cash Generated and Distributable Free Cash Flow Generated (both non-GAAP figures) for the same period equaled approximately $50.7 million and $49.3 million, respectively.

32.     Using the figures listed above, the Company promoted its "strong ratio of total liquid net assets to our cash distribution," emphasizing how the Company's "distribution coverage increased to 8.61 at December 31, 2011 compared to 5.36 at December 31, 2010." During this time period, the Company declared a distribution of $0.585 per unit.

33.     Shortly thereafter, on May 9, 2012, the Company issued a press release that announced results of operations and various "critical financial measures" for the three months ended March 31, 2012.  Once again, the Company directed investors' attention on non-GAAP measures, which varied discernably from the Company's GAAP financial results.  It was in this press release that the Company reported Total Revenues of approximately $59.59 million, Production Based Revenue of approximately $72.27 million, Operating Profit of approximately $5.4 million, Adjusted Operating Profit of approximately $14.76 million, Operating Cash Flows of approximately $8.19 million, Adjusted Operating Cash Generated of approximately $14.387 million, Distributable Free Cash Flow Generated of approximately $13.82 million, and Distribution Coverage Quarters of purportedly 8.77.  During this time period, the Company declared a distribution again of $0.585.

34.     It was in this press release that Defendant Miller expressed satisfaction with the Company's financial performance, stating: "We have increased our production based revenue and total GAAP revenues for the three months ended March 31, 2012.  Further we have increased both our operating profit and adjusted operating profit for the same period and we continue to generate strong distributable free cash flow."

35.     On August 7, 2012, the Company released its results of operations and its financial condition by issuing a press release.  The press release reported that Revenues (GAAP) for the three months ended June 30, 2012 increased by $1.4 million, or 2.3% to $61.5 million while Production Based Revenue (non-GAAP) for the same period increased by $5.6 million, or 8%, to $75.6 million.  Further, it was reported that Operating Profits (GAAP) decreased to $1.8 million while Adjusted Operating Profits (non-GAAP) increased to $12.6 million as compared to the same period last year.

36.     Defendants' emphasized the non-GAAP results to the expense of the GAAP financials, calling investors' attention to "the gain in production based revenue and adjusted operating profit [which purportedly] underscore [their] commitment to growth and profitability despite the economic background." Moreover, these measures "allow the investor to gain insight into the current operating performance of the company."   The Company continued its distribution rate unchanged and declared a distribution of $0.585 for the quarter.

37.     On November 6, 2012, the Company filed a Form 8-K with the SEC, and issued a press release that was attached as an exhibit thereto that announced its financial results for the three months ended September 30, 2012.  It was in this press release that Defendant Miller boasted about the strength of the quarter, highlighting the Company's non-GAAP financial metrics: "we experienced double digit percentage increases in our key performance metrics on a

year over year basis, with production based revenue rising 11.4%, adjusted operating profits rising 60.7%, and distributable free cash flow increasing 74%." He also stressed the Company's decision to increase its distribution from $0.585 to $0.59 per unit, citing "the strength of our business and our commitment to generate increasing returns for our unit holders."

38.     By year end 2012, the Company distributed approximately $47.45 million to its unitholders after raising $89.0 million through equity transactions.

39.     On February 19, 2013, the Company filed a Form 8-K with the SEC that announced a change in the Company's credit agreement entered into the previous year. The Company negotiated another $10 million increase in the maximum aggregate principal amount of the revolving credit facility under the credit agreement from $130.0 million to $140.0 million.

40.     Shortly thereafter, on March 15, 2013, the Company filed its Annual Report on Form 10-K for the period ending December 21, 2012, and reported that:

- Revenues (GAAP) improved from $228.4 million in 2011 to $242.6 million in 2012, a 6% increase.

- Production Based Revenue (non-GAAP) increased from $280.6 million in 2011 to $296.3 million in 2012, a 6% increase. Operating profits (GAAP) increased 41% to $13.8 million in 2012 as compared to $9.8 million in the 2011 year.

- Adjusted operating profits (non-GAAP) increased 11% to $53.8 million in 2012 from $48.6 million in 2011.

- Operating cash flows (GAAP) provided in the 12 months ended December 31, 2012 increased to $31.9 million from $5.5 million provided by operations in 2011, a 480% increase.

- Distributable free cash flow (non-GAAP) for 2012 was $53.3 million compared to $49.3 million for the same period last year, an 8% increase.

- Distributable cash available during the period (non-GAAP) exceeded distributions by $17.9 million for the year ended December 31, 2012, versus $12.2 million in 2011, a 47% increase.

41.     Shortly thereafter, on March 22, 2013, the Company announced that it had priced 1.4 million common units representing limited partner interests in the Company at a price to the public of $25.35 per unit (the "March 2013 Offering").

42.     The Company would announce an increase of its cash distribution to $0.595 per unit from $0.59 on April 24, 2013.  Defendant Miller would praise the Company's "second distribution increase in six months, and credited "all of [the Company's] growth strategies, *i.e.* cemetery acquisitions, funeral home acquisitions, *etc.* [as having] been on display of late and [stating how] this distribution increase is a reflection on our ability to successfully implement these strategies."

43.     On May 7, 2013, the Company announced its first quarter 2013 financial results and filed a Quarterly Report on Form 10-Q with the SEC for the three months ended March 31, 2013 (collectively, the "1Q13 10-Q").  Similar to the Company's previous filings, the Company reported both GAAP and non-GAAP financial results. However, this time, Defendant Miller attempted to undermine the Company's poor GAAP results by claiming that "our GAAP results were impacted, as they often are, by the timing of the recognition of certain revenues, which in turn impacted GAAP operating profit" and then drawing attention to "production-based revenues [and] adjusted operating profits and distributable free cash flow [which] each showed impressive growth." Specifically, the Company reported Revenues (GAAP) of $59.6 million compared to

Production-based Revenue (non-GAAP) of $80.2 million, which represented an increase of $7.9 million or 11% from the production-based revenue recognized the previous year.  Further, it was reported that Operating Profits (GAAP) decreased by $4.0 million, or 74%, to $1.4 million for the three months ended March 31, 2013, as comparted to $5.4 million in the prior-year period.  Yet, Adjusted Operating Profits (non-GAAP) curiously increased by $2.9 million, or 20%, to $17.7 million compared to $14.8 million in the same prior-year period. And, Operating Cash Flows (GAAP), purportedly decreased by $1.3 million, or 16%, to $6.9 million (compared to $8.2 million the previous year), while Distributable Free Cash Flow (non-GAAP) increased to $17.6 million from $13.8 million for the same prior-year period, representing a 28% increase.

44.     Following this release, the Company and its wholly owned subsidiaries, StoneMor Operating LLC, Cornerstone Family Services of West Virginia Subsidiary, Inc., and Osiris Holding of Maryland Subsidiary, Inc., announced on May 15, 2013, a cash tender offer to purchase any and all of their outstanding $150 million aggregate principal amount of 10.25% senior notes due 2017.  The Company also announced that it and its subsidiaries priced a private offering to eligible purchasers of $175 million aggregate principal amount of Senior Notes due 2021.  On May 24, 2013, the Company further announced that it had received by the expiration date, tenders and consents from the holders of approximately $132.2 million in aggregate principal amount, or approximately 88.1% of their outstanding 10.25% senior notes.

45.     Shortly thereafter, the Company announced an increase in its distribution. Defendant Miller stated: "In addition to managing our financial profile we are also committed to creating value for our unitholders.  The savings created by these actions, along with continued financial performance allow us to increase our distribution by a half a cent per quarter, the third such increase in the past eight months."

46.     On July 23, 2013, the Company announced a quarterly cash distribution of $0.60.

47.     On August 7, 2013, the Company issued a press release and filed its Quarterly Report on Form 10-Q with the SEC and announced its financial results for the period ended June 30, 2013 (collectively, the "2Q13 10-Q").  Defendant Miller provided additional reasons for the Company's poor GAAP results, including the costs associated with the refinancing of the Company's 10.25% Senior Notes in May 2013.  Accordingly, Defendant Miller shifted focus towards the Company's "other key performance measures, including "production-based revenues and adjusted operating profits, [which] showed solid year over year improvement."  For the period, Revenues were $62.4 million compared to $61.5 million, a 1.5% increase, while Production-based Revenue increased by $4.0 million, or 5.3%, to $79.6 million.  Further, Operating Profits increased by $0.5 million, or 29.4%, to $2.3 million, while Adjusted Operating Profits increased by $1.1 million, or 8.2%, to $13.7 million.

48.     In October, the Company announced an unchanged quarterly distribution of $0.60.

49.     On November 7, 2013, the Company issued a press release and filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2013 (collectively, the "3Q13 10-Q").  Defendant Miller offered an excuse for the Company's GAAP financials:

> "a land sale of $2.2 million to a private estate as impacting quarterly comparisons."

> *     *     *

> We are very happy that production-based revenue and adjusted operating profits both reflected solid gains due to increases in the value of pre-need cemetery contracts written, gains in investment income from trusts and strong funeral home revenues. We believe that production-based revenues and adjusted operating profits are meaningful measures for evaluating our performance because, among other items, they make adjustments for timing related items

we referred to previously. They are the measure by which management conducts the company's business and evaluates its performance.

50.     The Company's non-GAAP financials turned negative results into positives.  For example, the 3Q12 10-Q noted that Revenues were $61.5 million, down 1.1% from the prior-year period, but Production-based Revenue purportedly increased $5.5 million, or 7.3%, to $80.6 million when compared to the same period the previous year.  Operating Profits also decreased by $4.4 million, or 85.5%, to $0.7 million, but Adjusted Operating Profits apparently increased 4.2%, or $0.6 million, to $15.2 million.   By year end 2013, the Company distributed approximately $52.05 million to its unitholders after raising $38.38 million through equity transactions.

51.     On January 27, 2014, the Company announced its fourth quarter cash distribution, which remained at $0.60 per unit, payable February 14, 2014.

52.     Before the Company released its cash distribution for the fourth quarter of 2013, it announced another public offering.   On February 11, 2014, the Company priced 2 million common units representing limited partner interest in the Company at a price to the public of $24.45 per unit (the "February 2014 Offering").

53.     On March 14, 2014, the Company issued a press release and filed its Annual Report on Form 10-K with the SEC for the period ended December 31, 2013 (collectively, the "FY2013 10-K").   In the FY 2013 10-K, Defendant Miller expressed excitement over the "strategic actions taken in 2013 as well as so far in 2014, [calling out the results of the February 2014 Offering] when a recent unit offering raised approximately $53.1 million, primarily for the purpose of paying down borrowings."

54.     Defendant Miller assured the market that the Company "paid down its credit facility with the proceeds of the unit offering [*i.e.*, the February 2014 Offering]" in the Company's Quarterly Report on Form 10-Q filed with the SEC on May 8, 2014 (the "1Q14 10-Q").  The 1Q14 10-Q, and its accompanying press release, also stated that the Company "generated increases in both our GAAP revenue and production based revenue (non-GAAP) during the period.  At the same time, [the Company] saw strong increases in both operating profits and adjusted operating profits (non-GAAP) while generating a solid increase in distributable free cash flow."

55.     Shortly thereafter, on May 19, 2014, the Company announced a $130 million commitment by a private investment firm, American Infrastructure MLP funds ("AIM").  AIM, which was co-founded by Defendant Hellman, committed up to $130 million of capital to the Company and the General Partner, in exchange for an indirect majority interest in the General Partner.  As part of the commitment, AIM agreed to "purchase $55 million of four-year, non-cash common units to fund near-term acquisitions, and [I make available up to $50 million of additional capital contributions to fund growth."

56.     Thereafter, on May 29, 2014, the Company issued a press release entitled *StoneMor Partners L.P. Prices Public Offerings of Common Units*.  It was in this press release that the Company announced that it priced 2.6 million common units representing limited partner interests in the Company at a price to the public of $23.67 per unit (the "May 2014 Offering").  Accordingly, the Company estimated receiving "net proceeds of approximately $58.2 million from this offering after deducting underwriting discounts and offering expenses ($67.0 million if the underwriters exercise in full their option to purchase additional common units)."

57.     After receiving capital infusions directly from the February 2014 Offering, the private placement with AIM, and the May 2014 Offering, the Company announced, on July 25, 2014, an increase of its cash distribution to $0.61 per unit from $0.60.  Suggesting that the reason for the increase was due to the Company's strong performance and recent transactions, Defendant Miller stated in relevant part:

> With the strong performance of our base operations and the results we're beginning to see from these two transactions [i.e., the SCI Acquisitions and a long-term management relationship with the Archdiocese of Philadelphia], *we believe we should be able to increase distributions by at least $0.01 per unit each quarter through 2015*.  Lastly, although we can make no assurances, with the addition of the recently announced investment from a private equity firm [i.e., AIM], we hope to continue the upward trajectory of the distribution beyond that time frame.  [Emphasis added].

58.     In August 2014, the Company reaffirmed its intent to increase future distributions.  For example, on August 8, 2014, the Company issued a press release and filed with the SEC a Quarterly Report on Form 10-Q.  Defendant Miller provided guidance on future distributions:

> As we previously announced, these transactions, in combination with our existing core business, *provided us the ability not only to increase our distributions, but to also for the first time give guidance that we intend to increase our distribution by $0.01 per quarter at least through the end of 2015*.  That will make our distribution at the end of 2015 $0.66 per quarter or $2.64 per year.  That is an increase of approximately ten percent from today's levels.  [Emphasis added]

59.     After announcing a $0.62 distribution on October 24, 2014, on November 7, 2014, the Company filed its Quarterly Report on Form 10-Q with the SEC for the three months ended September 30, 2014.  The Company continued to tout both GAAP and non-GAAP financial results, stating that "Revenues and Production-based Revenues reached record levels."

17

60.     On November 12, 2014, Defendant Miller spoke at the Company's Second Annual Investor and Analyst Day.  It was here that Defendant Miller stressed the predictability of the Company's cash distribution to investors:

> We don't have a straight trajectory growth in our distributions. ***But one thing you can count on is the stability and the predictability. And if you followed any of our press we've actually committed to increasing the distribution a penny each quarter, at least through 2015 and we'll explain that a little bit later***. [Emphasis added].

61.     At the same Investor and Analyst Day, then-CFO Yost stated that it was the Company's GAAP financials that were misleading, calling for investors to rely on the Company's manufactured non-GAAP metrics:

> So when you if you look at our accrual our operating profit or non-GAAP or old GAAP operating profit, you see steady and consistent increases. It gets confused when you look at the GAAP. The revenues increase, profits increase, but GAAP results are a little misleading.

62.     Prior to the end of the year, the Company entered into another credit agreement (the "December 2014 Credit Agreement").  The December 2014 Credit Agreement "provides for a single revolving credit facility of $180 million maturing on December 19, 2019."  In addition, the December 2014 Credit Agreement provides for an uncommitted ability to increase the credit facility by an added $70 million.

63.     Toward the end of 2014, the Company distributed approximately $62.84 million to its unitholders after raising $173.50 million through equity transactions.

64.     On January 26, 2015, the Company announced another increased distribution for the 2014 fourth quarter.  In raising its cash distribution to $0.63 per unit from $0.62 per unit, Defendant Miller touted management's ability to "continue [the Company's] recent string of increased distributions to [its] unit holders" and indicated that the announcement further

demonstrates "that [the Company is] successfully executing [management's] business plan [who] are confident that [it] will continue to do so."

65.     On March 13, 2015, the Company issued its fourth quarter and fiscal year financial results.   Though year-over-year comparisons were allegedly impacted by "a combination of one-time items as well as the ongoing expenses associated with the build out of pre-need sales programs at the Archdiocese of Philadelphia, Defendant Miller underscored the "tremendous year," StoneMor experienced and claimed that StoneMor was "very well positioned for the future."

66.     The following month, the Company increased its cash distribution by $0.01 per unit, from $0.63 to $0.64.

67.     On May 8, 2015, Defendant Miller highlighted the Company's non-GAAP financial results — despite their having decreased compared to prior-year periods — as they portrayed a rosier picture of the Company's financial health when compared to the Company's audited financials.  For example, in the Company's Form 10-Q filed with the SEC for the three-month period ended March 31, 2015, Defendant Miller stated that the Company's:

> . . . adjusted operating profits (non-GAAP) for the first quarter were $16.0 million versus $22.0 million in the prior year period. Distributable free cash flow (non-GAAP) for the first quarter was $15.6 million versus $22.1 million in the prior year period. The quarterly declines in both adjusted operating profits and distributable free cash flow were both largely the result of two items. First, a land sale in the 2014 first quarter added $4.5 million to results and second, income (non-GAAP) from trusts in the 2014 first quarter was $3.6 million greater than the current quarter. Land sales are by their nature unpredictable, so the impact on results will vary.  At the same time, investment income from trusts varies widely from one quarter to the next and has no corresponding cost of sales.  As a result, its impact can be meaningful. Absent the effect of these variable items, adjusted operating income for the 2015 first quarter increased by $2.1 million, or 15.7%.

68.     Defendant Miller continued: "Looking behind the impact of the irregular items we see strong continued performance from production-based revenues, adjusted operating profit and distributable free cash flow.   We look forward to the further integration of our acquired properties and the impact that continued growth in pre-need sales will have on cash flow and profitability in the future."

69.     However, the Company's non-GAAP financials struggled to portray a financially healthy company.   Yet again, the Company announced a public offering that sought a capital injection to protect the cash distributions the Company promised to be paid out through 2015.

70.     On July 6, 2015, the Company offered 2.1 million common units representing limited partner interests in the Company at a price to the public of $29.63 per unit (the "July 2015 Offering").   According to the prospectus, the Company: (a) expected to receive net proceeds of approximately $58.9 million, after deducting the underwriting discount and offering expenses in connection with the offering; and (b) intended to use the net proceeds to pay down outstanding indebtedness under its revolving credit facility.

71.     Shortly after the July 2015 Offering, the Company announced an increased cash distribution of $0.65 per unit payable on August 14, 2015, up $0.01 from the previous quarter.

72.     Thereafter, on August 10, 2015, the Company announced its results for the three months ended June 30, 2015, filing with the SEC a Quarterly Report on Form 10-Q for the same period (the "2Q15 10-Q").   The Company reported that:

•     Revenues (GAAP) for the three months ended June 30, 2015 reached a record $80.8 million compared to $71.5 million for the three months ended June 30, 2014, a 13.0% increase.

- Production-based revenues (non-GAAP) for the three months ended June 30, 2015 reached a record $107.0 million compared to $86.9 million for the three months ended June 30, 2014, a 23.0% increase.

- Operating profits (GAAP) for the three months ended June 30, 2015 were $1.3 million compared to $3.3 million in the prior year period.

- Adjusted operating profits (non-GAAP) for the three months ended June 30, 2015 were $20.2 million compared to $14.3 million in the same period last year, a 41.8% increase driven largely by an increase in investment income from our trusts.

- Cash flows (GAAP) used in operations for the three-month period ended June 30, 2015 were $1.9 million compared to $9.7 million provided by operations in the prior year period. The decline was driven primarily by the continued ramp up of pre-need sales which increased contributions into our trusts. Distributable free cash flow (non-GAAP) for the three-month period ended June 30, 2015 increased to $19.2 million from $15.4 million in the prior year period. The increase was driven primarily by higher pre-need sales which generated increased inflows to the merchandise trust fund.

73.     Defendant Miller credited the Company's GAAP loss to "the deferral of revenues as well as a $3.5 million increase in corporate expenses arising from a combination of budgeting spending increases and other expenses associated with the ongoing integration of new properties." Accordingly, Defendant Miller drew investors' attention to the "continued strength in [the Company's] revenue growth and distributable free cash flow, [which] allowed [the Company] to increase [its] distribution for the second quarter by $0.01 per unit to $0.65 per unit as previously announced."

21

74.     Prior to releasing the next quarter's financial results, on October 27, 2015, the Company announced that it would again increase its cash distribution by $0.01 and declared a $0.66 per common unit distribution for the 3rd quarter 2015, which represented a 7% increase from the prior year 3rd quarter, and a 2% increase from the 2nd quarter of 2015.

75.     On November 9, 2015, the Company filed its Quarterly Report on Form 10-Q with the SEC that announced results for the third quarter of 2015 (the "3Q15 10-Q").  Therein, the Company highlighted the Company's Adjusted EBITDA and its Generated Distributable Available Cash, rather than its previously held "critical financial metrics" of Production-based Revenue, Adjusted Operating Profit, and Adjusted Operating Cash Generated.

76.     Upon information and belief, the Company often calculated so-called "Distributable available cash" to show that the distributions that were being made were less than the cash available on hand and that, therefore, such levels of distribution could be sustained.  In addition, the Company's abrupt transition away from its celebrated non-GAAP financial reporting metrics, to Adjusted EBITDA and Generated Distributable Available Cash likely was because these figures told a more compelling story.  For example, as stated in the 3Q15 10-Q, "Adjusted EBITDA, a non-GAAP measure, was $23.5 million for the 3rd quarter 2015, an increase of over 20% compared with the prior year 3rd quarter, [and] Generated Distributable Available Cash, a non-GAAP measure, [was] $32.2 million for the 3rd quarter 2015, [representing] a 7% increase from the prior 3rd quarter."  Thus, emphasizing these non- GAAP metrics, the Company could perpetuate the myth that the Company was generating funds from its operations to fund the distributions.

77.     On November 11, 2015, the Company held an Investor and Analyst Day to describe to unit holders the state of the business. In its presentation that day, the Company stated

that its "Distributable Available Cash" at year-end 2013 and 2014 was $79 million and $80 million, respectively, showing growth in the cash available, despite the large distributions to unit holders during 2014.  And yet, in its Earnings Release, the "Distributable Cash Available" at year-end 2013 and 2014 was shown to be $84 million and $73 million, respectively.  Again, these material discrepancies existed without any explanation.

78.     On November 11, 2015, Defendant McGrath would also explain at the Investor and Analyst Day, why the Company continued to emphasize non-GAAP financials and the disdain the Company had for the SEC's reporting requirements:

> ". . . I don't know if the SEC can get anymore screwed up with regard to revenue recognition rules. This might be a new level in terms of screwed up.  So this is why we moved towards the non-GAAP. [...]  But we look at how we characterize our cash flow on our press release and the non-GAAP measure of it.  We remove all of the arcane and bizarre deferral rules.  And we try to show people exactly, 'Listen, this is the activity we did during the period.  This is what we generated.  These are the costs associated with that.'  And that's why you can feel comfortable that we generate enough cash flow to pay a distribution in this period."

79.     A little over a week later, the Company announced (and entered into) an At-the-Market Issuance Sales Agreement with FBR Capital Markets & Co. ("FBR"), MLV & Co. LLC ("MLV") and Janney (collectively, the "Agents"), wherein the Company "may sell from time to time through the Agents the Partnership's common units representing limited partner interests having an aggregate offering price of up to $100,000,000." (The "November 2015 Offering").  Again, the agreement stated that the Company intended to use the proceeds from this public offering, "after deducting the sales agents' commissions and the Partnership's offering expenses, to pay down outstanding indebtedness under its revolving credit facility."

80.     By year end 2015, the Company distributed approximately $77.51 million to its unitholders after raising $75.16 million through equity transactions.

81. For the first time in six consecutive quarters, the Company did not announce an increase of its cash distribution for the fourth quarter of 2015 as part of its press release on January 26, 2016. Instead, Defendant Miller noted that the distribution represents a 5% increase over the prior year 4th quarter, and promised to "continue to contemplate further distribution increases as [the Company's] cash flow grows throughout calendar year 2016."

82. On February 29, 2016, the Company announced its financial results for the fourth quarter and fiscal year 2015. Again, without providing any explanation as to the Company's reason for shying away from its previously relied on non-GAAP financial measures, the Company reported: (a) Adjusted EBITDA of $26.5 million, representing an increase of over 15% from the prior year period; (b) Calendar year 2015 Adjusted EBITDA of $98.2 million, demonstrating an increase of almost 8% compared to the prior year; and (c) Generated Distributable Available Cash of $30.5 million for the 4th quarter and $83.0 million for calendar year 2015.

83. On the February 29, 2016 earning conference call to discuss fourth quarter 2015 financials, Defendant McGrath called the Company's management of the distribution "conservative," stating:

> ". . . but I think when you look at the cash distributions, and I don't want to speak for Larry, Larry can chime in, but I think when we looked as where we were in the previous year with regard to covering distribution, we believe that we were managing our cash distribution probably a little conservatively versus where it could be managed."

84. By March 7, 2015, these same figures had been filed on Form 10-K with the SEC as part of the Company's 2015 Annual Report (the "2015 Annual Report"). The 2015 Annual Report addressed the Company's internal controls for financial reporting:

As of the end of the period covered by this report, we carried out an evaluation, under the supervision and with the participation of our Disclosure Committee and management, including our Chief Executive Officer and our Chief Financial Officer, of the effectiveness of our disclosure controls and procedures pursuant to Exchange Act Rule 13a-15(b).  Based upon, and as of the date of this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective to provide reasonable assurance that information we are required to disclose in our reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

85.     On April 7, 2016, the Company announced another public offering (the "April 2016 Offering").  The Company priced the offering the following day at a price to the public of $23.65 per unit.  By April 15, 2016, the Company had filed with the SEC a Registration Statement announcing the April 2016 Offering.  Proceeds net expenses were expected to be approximately $44.7 million (or approximately $51.5 million if the underwriters exercised their option to purchase an additional 300,000 common units in full).

86.     In the Registration Statement, the Company stated that it "intend[s] to use the net proceeds from this offering, including any net proceeds from the underwriters' exercise of their option to purchase additional common units, to pay down outstanding indebtedness under our revolving credit facility."

87.     The Registration Statement also addressed the Company's quarterly distributions of available cash: "[a]vailable cash for any quarter consists of cash on hand at the end of that quarter, plus cash on hand from working capital borrowings made after the end of the quarter but before the date of determination of available cash for the quarter, less cash reserves."

88.     On May 9, 2016, the Company filed with the SEC on Form 10-Q its operating and financial results for the period ending March 31, 2016 (the "1Q16 10-Q").   Therein, the Company announced: (a) Adjusted EBITDA of $21.9 million compared to $21.7 million for the prior year; and (b) Generated Distributable Available Cash of $29.0 million compared to $25.9 million in the prior year, a purported increase of more than $3 million, or 12%.

89.     That same day, the Company issued a press release which the 1Q16 10-Q incorporated by reference.   In the press release, Defendant Miller commented on the Company's performance:

> The first quarter is traditionally our most challenging, particularly in the area of pre-need sales. . . .   While we underperformed our own expectations for the 1st quarter, we continue to believe that we will accomplish our goals for 2016, which include achieving Adjusted EBITDA of at least $26 million for the 2nd quarter 2016, and full year Adjusted EBITDA between $106 million and $115 million.

90.     The 1Q16 10-Q referred to the Company's April 2016 Offering, assuring investors that the proceeds from the issuance were used to pay down outstanding debt:

> On April 20, 2016, the Partnership completed a follow-on public-offering of 2,000,000 common units at a public offering price of $23.65 per unit. Net proceeds of the offering, after deducting underwriting discounts and offering expenses, were approximately $44.7 million.   Additionally, the underwriters of the follow-on public offering exercised their option to purchase an additional 300,000 common units at the public offering price of $23.65 per unit, resulting in net proceeds of $6.8 million, after deducting underwriting discounts and offering expenses. The proceeds from the issuances were used to pay down outstanding indebtedness under the Credit Facility.

91.     On May 31, 2016, the Company announced that Defendant McGrath was slated to present at the Master Limited Partnership Association's 2016 Annual investor Conference scheduled for June 2, 2016 (the "MLP Conference").   While at the MLP Conference, Defendant

McGrath responded to inquiries regarding the timing and amount of the Company's equity offering and the amount of its distributions.  Defendant McGrath stated:

> "[w]e do not raise equity to pay distributions", ". . . we're able to turn those cash flows really into bottom line earnings to our investors and turn that into cash distributions for them", and "People say you raise equity to pay your distributions but that couldn't be further from the truth."

92.     On August 5, 2016, the Company filed with the SEC on Form 10-Q its operating and financial results for the period ended June 30, 2016 (the "2Q16 10-Q").   Among other things, the Partnership: (a) declared its 47th consecutive quarterly cash distribution, though the amount per unit remained the same, at $0.66; (b) reported Adjusted EBITDA of $23.0 million for the second quarter, representing a decrease of $3.6 million compared to $26.6 million for the prior year period; and (c) reported Distributable Cash Flow of $16.8 million for the second quarter compared with 19.6 million for the prior year period, representing a decrease of $2.8 million.

93.     Defendant Miller blamed the Company's pre-need cemetery division sales and StoneMor's sales force for causing the Company's poor performance:

> While pre-need sales in our cemetery division rebounded strongly from the prior two quarters, they are not yet at levels we anticipated and were a significant driver of our shortfall to previously announced guidance for the period.
>
> We decided last year to focus our efforts on ensuring we have the highest quality salesforce possible and reducing salesforce turnover to better drive sales. In order to achieve these goals and be well positioned for future growth, we made structural changes which resulted in the elimination of our underperforming sales professionals. Because of our increased selectivity in filling these vacancies, headcount was slow to ramp, resulting in fewer salespeople engaging customers and pre-need sales falling below acceptable levels.  The corrective action we are taking to improve overall sales performance is taking longer than we expected to implement and yield results.  We expect to announce additional

measures in the coming weeks and once our salesforce returns to its optimal size and strength, we expect pre-need sales to return to targeted growth levels.

94.     However, upon information and belief, Defendant Miller knew that the Company was in financial jeopardy, relying on capital received from debt or equity offerings to pay out and maintain cash distributions in accordance with the General Partner's directive.

95.     On September 2, 2016, the Company issued a press release that announced that the Company intended to restate its consolidated financial statements for the fiscal years ended December 31, 2013 through 2015 and the fiscal quarters ended March 31, 2016 and June 30, 2016. According to the Company's September 2, 2016 Form 8-K:

> "upon further review of prevailing accounting literature, and in consultation with the Audit Committee of its Board of Directors, the partnership determined that it incorrectly allocated net loss to the general partner and its limited partners for the referenced historical periods."

96.     Rather than acknowledge the true impact on the Company's financials, Company's September 2, 2016 Form 8-K assured unitholders and analysts that "the restatement is not expected to have any impact to net income (loss), total assets, total liabilities, total partner's capital, Adjusted EBITDA, Distributable Cash Flow, or cash distributions."

97.     The statements above were false and misleading because the Company was using proceeds from debt offerings and equity issuances to pay distributions and not to pay down indebtedness under the Company's revolving credit facility, while simultaneously assuring investors that its "profit" distributions were safe based on the Company's manufactured and misleading non-GAAP financials.  In truth, when the Company's access to the capital and debt markets dried up, the distribution was cut in half.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

98.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by Defendants.

99.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

100.    Plaintiff is a current owner of the Company stock and has continuously been an owner of the Company stock during all times relevant to Defendants' illegal and wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

101.    During wrongful course of conduct at the Company, the Board consisted of Defendants.  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

102.    The Company Board is currently comprised of nine (9) members – Miller, Carver, Freedman, Lautman, Talbott, Shane, Contos, Hellman, and Pound.  Thus, Plaintiff is required to show that a majority of Defendants, *i.e.*, five (5), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

103.    Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects. Because of their advisory, executive, managerial, and directorial positions with the Company,

each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

104.    Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

105.    Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

106.    Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

107.    Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

108.    Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action.  Each of them is in a position of irreconcilable

conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

109.    Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

### DEFENDANT MILLER

110.    Miller founded the Company and has served as Chief Executive Officer (CEO), President and Chairman of the Board since April 2004 and served as the Chief Executive Officer and President of Cornerstone[1], since March 1999 through April 2004.

111.    Miller is not disinterested or independent, and therefore, is incapable of considering demand because Miller (as CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Miller cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

---

[1]    Cornerstone was founded in 1999 by members of the Company's management team and a private equity investment firm -- McCown De Leeuw.  Unlike the holders of common stock in a corporation, unitholders have only limited voting rights on matters affecting StoneMor's business.  Unitholders do not have the right to elect StoneMor's general partner or its directors on an annual or other continuing basis.  StoneMor's general partner may not be removed except by the vote of the holders of at least 66 2/3% of the outstanding common and subordinated units, including units owned by the general partner and its affiliates, voting together as a single class. Because of their controlling ownership interest in the Company's general partner, the McCown De Leeuw funds are able to control the election of a majority of the directors of StoneMor's general partner, and because these funds indirectly control greater than 33 1/3% of the units, they are able to prevent the removal of the general partner.

112.     Miller also lacks independence from Defendants Talbott, Hellman or Lautman, defendants who are not disinterested and who exert influence over Miller's compensation by virtue of their positions as representing the entire Compensation Committee.

113.     In addition, pursuant to Miller's Employment Agreement with the Company, Miller was eligible for an annual bonus if certain financial targets were met (hence, perpetrating the above fraud on the market):

> 3.01.   The Executive shall be paid a base salary during the Employment Period at the annual rate of three hundred and fifty thousand Dollars ($350,000), payable in accordance with the regular payroll practices of the Company.  The Company's Board or its Compensation Committee ("Compensation Committee") shall annually review the Executive's performance and determine, in its sole discretion, whether or not to increase the Executive's base salary and, if so, the amount of such increase. The Executive's base salary as in effect from time to time is hereinafter referred to as the "Base Salary".
>
> 3.02.   ***The Executive shall be eligible for an annual bonus based upon satisfaction of mutually agreed upon targets established by the Company and approved by the Company's Board or the Compensation Committee*** on or around January 31 of each year for such year.  The Executive may, at the Company's discretion, receive a bonus of up to 50% of Base Salary for meeting budgeted goals if no such mutually agreed targets are established.

**DEFENDANT CARVER**

114.     Carver has served on the Board since August 2005.  Carver retired in June 2002 from Ernst & Young.  Carver is a member of the Audit Committee.  As a member of the Audit Committee, he was required to: (i) review the type and presentation of information to be included in the Company's earnings press releases, as well as financial information and earnings guidance provided by the Company to analysts and rating agencies, (ii) review the adequacy and effectiveness of the Company's accounting and internal control policies and procedures on a regular basis, and (iii) review the adequacy of the Company's independent auditor. Defendant

Carver breached his fiduciary duties of due care, loyalty, and good faith, because as a member of the Audit Committee, he allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting issues and deficiencies described above.  Therefore, Carver face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon him is futile.

### DEFENDANT FREEDMAN

115.    Freedman served on the Board since April 2004, and served as a director of Cornerstone since October 2000 through April 2004.  Freedman is a member of the Audit Committee.  As a member of the Audit Committee, he was required to: (i) review the type and presentation of information to be included in the Company's earnings press releases, as well as financial information and earnings guidance provided by the Company to analysts and rating agencies, (ii) review the adequacy and effectiveness of the Company's accounting and internal control policies and procedures on a regular basis, and (iii) review the adequacy of the Company's independent auditor.  Freedman breached his fiduciary duties of due care, loyalty, and good faith, because as a member of the Audit Committee, *inter alia*, he allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting issues and deficiencies described above.  Therefore, Freedman faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

**DEFENDANT LAUTMAN**

116.    Lautman has served on the Board since April 2004 and served as a director of Cornerstone from March 1999 through April 2004.

**DEFENDANT TALBOTT**

117.    Talbott has served on the Board since April 2004 and served as Chairman of the Board of Cornerstone since April 2000 through April 2004.  Talbott currently serves as an operating affiliate of American Infrastructure Funds, L.L.C.  Further, American Cemeteries Infrastructure Investors, LLC owns 2,255,947 outstanding share of Company stock, which totals 7.7% of the outstanding shares of the Company.

**DEFENDANT SHANE**

118.    Shane has served on the Board since April 2004.  Shane founded the Company with Miller and served as Executive Vice President and Chief Financial Officer of the Company from April 2004 until April 1, 2012, and served as Executive Vice President and Chief Financial Officer of Cornerstone since March 1999 through April 2004.   Effective April 1, 2012, Shane retired from his position as the Executive Vice President and Chief Financial Officer and became the Vice Chairman of the Board and serves as an advisor available to management.  Prior to joining Cornerstone, Shane was employed by The Loewen Group, Inc., where he served as Senior Vice President of Finance for the Cemetery Division from March 1995 until January 1998.  Prior to joining The Loewen Group, Shane served as Senior Vice President of Finance and Chief Financial Officer of Osiris Holding Corporation, which he founded with Miller, and of which he was a one-third owner.

119.    In addition, pursuant to Shane's Employment Agreement with the Company, Shane was eligible for an annual bonus if certain financial targets were met (hence, perpetrating the above fraud on the market):

> 3.01.   The Executive shall be paid a base salary during the Employment Period at the annual rate of three hundred and fifty thousand Dollars ($350,000), payable in accordance with the regular payroll practices of the Company. The Company's Board or its Compensation Committee ("Compensation Committee") shall annually review the Executive's performance and determine, in its sole discretion, whether or not to increase the Executive's base salary and, if so, the amount of such increase. The Executive's base salary as in effect from time to time is hereinafter referred to as the "Base Salary".

> 3.02.   ***The Executive shall be eligible for an annual bonus based upon satisfaction of mutually agreed upon targets established by the Company and approved by the Company's Board or the Compensation Committee on or around January 31 of each year for such year***. The Executive may, at the Company's discretion, receive a bonus of up to 50% of Base Salary for meeting budgeted goals if no such mutually agreed targets are established.

> 3.03.   The Executive shall be entitled to participate in any of the Company's other discretionary bonus or performance-based bonus programs for senior executives of the Company on such terms and conditions as determined in the discretion of the Company's Board or the Compensation Committee.

### DEFENDANT CONTOS

120.    Contos has served on the Board since August 2014.  Since December 2015, Contos has been a Principal of American Infrastructure Funds, L.L.C., an investment adviser registered with the SEC, where he was previously a Vice President from December 2013 to December 2015 and a Senior Associate from September 2012 to December 2013.  Further, American Cemeteries Infrastructure Investors, LLC owns 2,255,947 outstanding share of Company stock, which totals        7.7% of the outstanding shares of the Company.

**DEFENDANT HELLMAN**

121.    Hellman served on the Board since April 2004 and served as a director of Cornerstone since March 1999 through April 2004.   Hellman owns 2,271,858 shares of outstanding Company stock, which is 7.8% of all outstanding shares.

122.    Hellman is also the Chief Executive Officer and a Managing Director of McCown De Leeuw & Co., LLC, which he joined in 1987.   McCown De Leeuw & Co., LLC is the sponsor of numerous private equity investment funds.   Hellman was named Managing Director in 1991 and Chief Executive Officer in 2001.

**DEFENDANT POUND**

123.    Pound served on the Board since August 2014.   Pound is a Certified Public Accountant and a member of the American and Pennsylvania Institutes of Certified Public Accountants.    Having an accounting background, Pound should have been aware of the fraud listed above and failed to ensure that adequate internal controls were in place regarding the serious accounting issues and deficiencies described above.   Therefore, Pound faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

**ADDITIONAL INFORMATION**

124.    Below is a chart of the organizational structure of the Company before going public.  Cornerstone Family Services LLC owned 85% of the common stock.  Defendants Miller, Freedman, Lautman, Talbott, Shane and Hellman worked for Cornerstone:



Organizational Structure Before the Transactions

125.   Below is a chart of the Company after it went public.  McCown De Leeuw is the beneficial owner of approximately 87.8% of the Class B units of CFSI LLC (noted below in chart) through its direct ownership of approximately 10.6% of the Class B units of CFSI LLC and indirectly through its ownership of approximately 90.8% of the membership interests in Cornerstone Family Services LLC, which owns approximately 85% of the Class B units of CFSI LLC.  McCown De Leeuw also owns approximately 96.3% of the Class A units of CFSI LLC:



126.    Further, under the Amended and Restated Limited Liability Company Agreement

of Cornerstone Family Services LLC, McCown De Leeuw has the right to designate at least three

individuals, and such other greater number of individuals, to serve on the board of managers of

Cornerstone Family Services LLC.  In addition, for so long as Miller serves as an officer of

Cornerstone Family Services, LLC, he will also serve as a manager of Cornerstone Family Services LLC, and for so long as Shane serves as an officer of Cornerstone Family Services LLC, he will also serve as a manager of Cornerstone Family Services, LLC.

**FIRST CAUSE OF ACTION**
**(Against Defendants for Breach of Fiduciary Duties)**

127.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

128.    Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

129.    Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

130.    Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. In breach of their fiduciary duties owed to the Company, Defendants failed to properly oversee the Company's business, rendering them personally liable to the Company for breaching their fiduciary duties.

131.    Defendants had actual knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

132.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

133.    As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and

goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION
### (Against Defendants for Gross Mismanagement)

134.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

135.    By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

136.    As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of millions of dollars.

137.    Because of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

## THIRD CAUSE OF ACTION
### (Against Defendants for Unjust Enrichment)

138.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

139.    By their wrongful acts and the omissions of material fact that they caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

140.    Defendants either received bonuses, stock options, or similar compensation from the Company that was tied to the financial performance or artificially inflated valuation of the Company or received compensation that was unjust in light of Defendants' bad faith conduct.

141.    Plaintiff, as a shareholder and a representative of the Company, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary duties.

**FOURTH CAUSE OF ACTION**
**(Against Defendants for Violations of Section 14(a)**
**of the Securities Exchange Act of 1934 and Rule 14a-9)**

142.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

143.    Rule 14a-9 was enacted pursuant to § 14(a) of the Securities Exchange of 1934, and provides in relevant part:

> "No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading..."

144.    In this case the Company's Proxy statements filed on October 9, 2014 violated § 14(a) and Rule 14a-9 because it omitted material information regarding Defendants wrongful conduct, and included by reference materially false and misleading financial statements.

145.    The Company filed its Schedule 14A with the SEC on October 9, 2014 (the "Proxy"), and which incorporated by reference all of the Company's public filings over the previous year.

41

146.    Defendants caused the Company to issue the Proxy containing false and misleading information and/or failed to disclose material adverse information about the Company.  This false and misleading information and/or omitted material adverse information included:  the Company's reported non-GAAP financial metrics were materially misleading and concealed the truth about the Company's actual financial condition.

147.    In the exercise of reasonable care, Defendants should have known that the statements contained in the Proxy were materially false and misleading.

148.    The misrepresentations and omissions in the Proxy were material to Company shareholders in voting on each of these proxies.

149.    As a proximate result of Defendants' material misrepresentations and omissions in the Proxy, the Company was damaged.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' wrongful conduct, including breaches of their fiduciary duties;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  February 2, 2017

                                 **HYNES KELLER & HERNANDEZ, LLC**

                                 By: */s/ Michael J. Hynes*
                                 Michael J. Hynes
                                 Ligaya T. Hernandez
                                 101 Lindenwood Drive, Suite 225
                                 Malvern, PA 19355
                                 Telephone: (484) 875-3116
                                 Facsimile: (914) 752-3041
                                 Email: mhynes@hkh-lawfirm.com
                                         lhernandez@hkh-lawfirm.com

                                 **GAINEY McKENNA & EGLESTON**
                                 Thomas J. McKenna
                                 Gregory M. Egleston
                                 440 Park Avenue South, 5th Floor
                                 New York, NY  10016
                                 Telephone: 212-983-1300
                                 Facsimile: 212-983-0383
                                 Email: tjmckenna@gme-law.com
                                         gegleston@gme-law.com

                                 *Attorneys for Plaintiff*

## VERIFICATION

I, Mark J. Bunim, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of StoneMor Partners, L.P. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of StoneMor Partners, L.P. common stock at all relevant times.

Date: February ___, 2017

_____
MARK J. BUNIM